UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN SILVER,
        Plaintiff,

No. 1:07-cv-103

-v-

HONORABLE PAUL L. MALONEY

MARK GILES, et al.,
        Defendants.

<u>OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>

This matter comes before the Court on a motion for summary judgment by Defendants. Defendants Mark Giles (Officer Giles), Mark Lytle, Richard Rosenberg, Tino Reyes, William Giles (Chief Giles) (collectively "Officers"), the Saugatuck-Douglas Police Department, and the City of of Douglas filed their motion (Dkt. No. 87) for summary judgment. Plaintiff Stephen Silver filed a corrected response. (Dkt. No. 90.) Defendants filed a reply. (Dkt. No. 92.) This Court has read the motion, supporting and opposing briefs, attached exhibits and relevant authority. Oral argument is not required to resolve the contested issues. *See* W.D. MICH. L.CIV.R. 7.2(d).

I. BACKGROUND

Plaintiff Stephen Silver alleges, through 42 U.S.C. § 1983, violations of his civil rights by various police officers. Count I of the complaint, the only count remaining in this action, is titled "violations of the 4th and 14th amendment/unlawful arrest/malicious prosecution." (Compl.) The interactions between the officers and Plaintiff occurred as the result of complaints made by Plaintiff Silver's ex-wife, Gail Rutledge.[1] Both Plaintiff and Gail Rutledge have ties to southwest Michigan.

---

[1]Gail Rutledge was named as a defendant in the original complaint, but has since been dismissed from the action.

Plaintiff graduated from Allegan High School in Allegan, Michigan and then from Western Michigan University. (Plaintiff's Exhibit A and Defendants' Exhibit 1 - Silver Dep. at 9.) His father still lives in Allegan. (Defendants' Exhibit 3 - Kent Dep. at 18.) After working in several different states, Plaintiff eventually moved to Colorado. (Silver Dep. at 10-11.) When Plaintiff met Ms. Rutledge, she was living in the Douglas-Saugatuck area. (Defendants' Exhibit B - Rutledge Dep. at 21-23, 32.) They were married in Aspen, Colorado in February 2002 (Silver Dep. at 8), and Ms. Rutledge then moved to Colorado (Rutledge Dep. at 22-23). Plaintiff soon filed for divorce, which was finalized in July 2003. (Silver Dep. at 8.) Ms. Rutledge then moved back to the Douglas-Saugatuck area.

Although the parties generally agree on the fact that certain events have occurred, they disagree on many of the details of those events, as well as the significance of each event. Mr. Silver and Ms. Rutledge's contentious relationship continued after their divorce. The divorce decree included an agreement between the parties that they would have no intentional contact with the other, either in person, in writing, by telephone or email. (Exhibit 1 to Silver Dep. - Divorce Decree Art. 18.) As a result of a telephone call Plaintiff admits making to Ms. Rutledge's parents in November 2003 (Silver Dep. at 58), Ms. Rutledge called the Saugatuck-Douglas police department. (Kent Dep. at 12.) No formal complaint was filed (*Id.* at 17). A personal protection order (PPO) was issued by Judge Corsiglia of the Allegan County Circuit Court on December 18, 2003 prohibiting Plaintiff from, among other things, contacting Ms. Rutledge. (Plaintiff's Exhibit 4 - 1st PPO.) Ms. Rutledge again contacted the police department in January 2004 to complain that Plaintiff violated the divorce decree by sending letters to her. (Kent Dep. at 23.) Plaintiff acknowledges sending alimony checks, along with notes attached. (Silver Dep. at 60.) Plaintiff

2

justified sending the letters to her because Ms. Rutledge's attorney in Colorado, who had been receiving the alimony checks, had withdrawn from representing Ms. Rutledge after Ms. Rutledge returned to Michigan. (*Id.*)

The first physical interaction between Plaintiff and Defendant Officers occurred on March 26, 2005. Plaintiff was supposed to meet his brother and sister for dinner in Douglas, Michigan. (Silver Dep. at 64.) Plaintiff parked his car down the street from the Everyday People Café and decided to "kill some time looking at galleries before my brother and sister showed up." (*Id.* at 65.) Plaintiff opened the door to one of the galleries and saw Ms. Rutledge behind the cash register. (*Id.* at 65-66.) Plaintiff states he did not know she worked there. (*Id.* at 66.) Plaintiff alleges he said "oh my god" and then "maybe we'll talk sometime." (*Id.*) Ms. Rutledge alleges Plaintiff told her "oh boy, yeah, we've got to talk sometime. You don't know what you're in for." (Rutledge Dep. at 104.) Plaintiff then closed the door (*Id.*) and went to dinner. (Silver Dep. at 66.) Ms. Rutledge called the police. (Plaintiff's Exhibit 8 - Officer Giles Dep. at 14.)

Officer Giles interviewed Ms. Rutledge about the incident. She told him that she had a PPO against Plaintiff, but that it had expired in February. (Officer Giles Dep. at 15.) Officer Giles alleges he called Central Dispatch and was advised there was no PPO in effect. (*Id.*) After talking with Ms. Rutledge, Officer Giles had a "feeling she was truly afraid of Mr. Silver." (*Id.* at 17.) John Thomas, the owner of the gallery, offered to go to the restaurant to see if Plaintiff was there. (*Id.* at 18.) Officer Giles then went to the restaurant to talk with Plaintiff. (*Id.* at 20.) Plaintiff alleges Officer Giles informed him he was in violation of a PPO. (Silver Dep. at 70, 74.) Officer Giles then gave Plaintiff a trespass warning, telling him not to go into the gallery or be around it. (Officer Giles Dep. at 21-22; Silver Dep. at 73.) Officer Giles sent a copy of his report to the prosecutor to review

3

for the possibility of issuing a warrant against Plaintiff for stalking. (Officer Giles Dep. at 25-26.) The prosecutor's office decided not to issue a warrant. (*Id.* at 26.)

As a result of the incident on March 26, Ms. Rutledge sought another PPO against Plaintiff. Judge Corsiglia signed the PPO on March 28, 2005, effective through March 28, 2006. (Plaintiff's Exhibit 10 - 2nd PPO.) Michigan's PPO form, under section (e), allows the signing judge to prohibit an individual from doing certain things by marking up to seven boxes, each of which corresponds to provisions found in MCL §§ 750.411h and 750.411i. The copy of the PPO submitted by Plaintiff shows Judge Corsiglia checked the box next to the phrase "following petitioner or appearing within his/her line of sight." (*Id.*) Judge Corsiglia then crossed out the phrase "or appearing within his/her sight."[2] The copy of the PPO submitted by Defendants shows Judge Corsiglia underlined, rather than crossed out" the phrase "or appearing within his/her line of sight."[3] (Exhibit 7 to Defendants' Exhibit E.)

A certified mail receipt date stamped March 28, 2005, included in both parties' exhibits, shows someone paid $4.65 to mail something to Plaintiff. (Plaintiff's Exhibit 11; Defendants' Exhibit K.) The address portion of the receipt is not filled out. On May 5, 2005, Judge Corsiglia signed an order authorizing alternate service of the PPO on Plaintiff. The order authorized serving Plaintiff by first class mail at an address specified on the order as well as tacking the order on the door at the same address. (*Id.*) Part of Defendants' exhibit is a tracking/confirmation receipt showing a letter was sent on May 6, 2005 to Plaintiff in Denver, Colorado and was delivered on May

---

[2]As it appears on Plaintiff's Exhibit 10, the form reads "☒ following petitioner ~~or appearing within his/her sight.~~"

[3]As it appears on Defendants' Exhibit 7 to Exhibit E, the form reads "☒ following petitioner <u>or appearing within his/her sight.</u>"

4

9, 2005 at 8:21 a.m. (Defendants' Exhibit 11.)

The next incident between Plaintiff and the Police Department occurred on June 10, 2005. Plaintiff states he was meeting Ms. Kimberly Dixon and her mother at the Copper Grille, another restaurant in Douglas, Michigan. (Silver Dep. at 77.) Plaintiff states he and Ms. Dixon had just started dating.[4] (*Id.* at 78.) Plaintiff parked about a block away from the restaurant. (*Id.* at 78-79.) Where he parked, Plaintiff had to walk through an alley and pass by the gallery where he had seen Ms. Rutledge working in March. (*Id.* at 79-80.) Ed Green, who was working in the gallery, stated he saw Plaintiff at the back window and that Plaintiff smiled at him. (Defendants' Exhibit J - Green Dep. at 11-12.) Mr. Green found Ms. Rutledge and told her he had seen Plaintiff walking by the store.[5] (*Id.* at 12-14.) Ms. Rutledge then called the police. Ms. Rutledge asserts she observed Plaintiff walking to the Copper Grille (Rutledge Dep. at 110), but concedes she does not recall if she told the police that she saw Plaintiff (*Id.* at 112-114.) Officer Lytle, who responded to Ms. Rutledge's call, indicated Ms. Rutledge became aware Plaintiff was in the area when Mr. Green told her he saw Plaintiff. (Plaintiff's Exhibit 2 - Lytle Dep. at 37.) According to Officer Lytle, Ms. Rutledge gave him a copy of the PPO[6] and he verified its conditions with Central Dispatch. (*Id.* at 29.)

Officer Lytle approached Plaintiff in the restaurant. (*Id.* at 39.) Officer Lytle informed

---

[4]Ms. Dixon, in her deposition, indicates the two had been dating for several years at this point. Ms. Dixon states the two met and began dating while Plaintiff was getting divorced from Ms. Rutledge.. (Plaintiff's Exhibit 5 - Dixon Dep. at 8-11.) Aaron Silver, Plaintiff's brother, testified that the two did not start dating until after the divorce was finalized. (Plaintiff's Exhibit 6- Aaron Silver Dep. at 36.)

[5]Ms. Rutledge was eating dinner at the Everyday People Café at the time.

[6]Officer Lytle states the copy of the PPO he looked at had the "line of sight" language underlined. (Lytle Dep. at 34.)

Plaintiff that he was violating the "line of sight" prohibition in the PPO issued against him. (*Id.* at 39.) Plaintiff told Officer Lytle he was not aware of any PPO and had not been served with a PPO. (Silver Dep. at 84; Lytle Dep. at 39-40.) Officer Lytle testified he verified with Central Dispatch that Plaintiff had been served with the PPO. (*Id*. at 40.) Officer Rosenberg, who had joined Officer Lytle, asked Plaintiff if he would look out the window of the restaurant and read the words on the sign on the store across the street. (*Id.*; Plaintiff's Exhibit 12 - Rosenberg Dep. at 20.) When Plaintiff read the signs, Defendant Officers informed Plaintiff he was obviously violating the "line of sight" prohibition in the PPO. (Lytle Dep. at 40; Rosenberg Dep. at 20.) Defendant Officers testified Plaintiff had also violated PPO provision prohibiting Plaintiff from appearing at Ms. Rutledge's place of work. (Lytle Dep. at 41; Rosenberg Dep. at 20-21.) Defendant Officers then placed Plaintiff under arrest for violating the PPO, handcuffed him, and took him to jail. (Lytle Dep. at 44-45; Rosenberg Dep. at 23; Silver Dep. at 85-86.) Plaintiff spent three hours in jail before he was released on bond. (Silver Dep. at 87-88.)

Two days later, at 9:43 a.m., Gail Rutledge again called the police department to report Plaintiff was violating the PPO. (Plaintiff's Exhibit 13 - 9-1-1- Transcript.) Ms. Rutledge claimed she was leaving her apartment[7] and saw Plaintiff walking next to the Everyday People Café. (Rutledge Dep. at 129.) Ms. Rutledge, who was with her brother, asserts Plaintiff was with members of his family, "two women with dark hair and an older man." (*Id.* at 138.) Officer Reyes responded to the call. (*Id.* at 151; Plaintiff's Exhibit 14 - Reyes Dep. at 8.) According to Officer Reyes, Ms. Rutledge told him she had a PPO against Plaintiff, one of the conditions was that Plaintiff was not

---

[7]Ms. Rutledge was living in an apartment above the art gallery where she worked. (Rutledge Dep. at 132.)

to be within her line of sight, and Plaintiff had been arrested on June 10 for violating the order. (*Id.* at 11-12.) Officer Reyes does not recall whether he verified the existence of the PPO or its conditions with Central Dispatch. (*Id.* at 12.) Officer Reyes does not recall whether he went to the Everyday People Café to look for Plaintiff. (*Id.* at 15.) Officer Reyes had Ms. Rutledge and her brother fill out written statements. (*Id.* at 18; Rutledge Dep. at 153.) Officer Reyes did not witness the two fill out the statement and the statements were brought to the police station sometime later. (Reyes Dep. at 18-19.) Officer Reyes then drove to an address given to him by Ms. Rutledge where she said Plaintiff might be staying. (*Id.* at 22.) Officer Reyes did not see anyone at the house and no one answered the door when he knocked. (*Id.* at 24.) He claims he left his business card in the door with a note asking someone to call him. (*Id.*) Later, Officer Reyes submitted a request for a warrant to arrest Plaintiff for stalking and for violating the PPO. (*Id.* at 26-28.) At some point the prosecutor's office reviewed the request and issued a warrant for Plaintiff's arrest. (Giles Dep. at 50-51.)

Plaintiff was arraigned on July 21, 2005 for the June 10, 2005 PPO violation. Plaintiff submitted a copy of the transcript of the arraignment. (Plaintiff's Exhibit 21.) Judge Corsiglia indicated he had nothing to arraign Plaintiff on because no complaint had been filed by the police department. (*Id.* at 3.) On June 13, 2005, three days after Plaintiff's arrest, Judge Corsiglia sent a letter to the Allegan County Law Enforcement Personnel stating, in all PPO violation cases, a complaint form must be filled out and submitted to the court, along with the police report. (Plaintiffs' Exhibit 19.) No one appeared at the hearing on behalf of the prosecution. Mr. Silver's attorney asserted Mr. Silver had never been served with the PPO. (*Id.* at 3-4.) Judge Corsiglia clarified the "line of sight" language on the PPO was crossed out, not underlined (*Id.* 4-5), and

7

conceded that it might not have been clear that he intended to cross out the language. (*Id.* at 5.) Officer Giles was subpoenaed to the hearing by Ms. Rutledge's attorney and was present in the courtroom during the discussion. (Giles Dep. at 43.) Judge Corsiglia dismissed the action and released the bond on Plaintiff. (Hearing Transcript at 8.)

Later that day, Ms. Rutledge again called the police department to tell them Plaintiff was having dinner across the street from her apartment and place of business. (Giles Dep. at 53.) Officer Giles and Chief Giles responded to the call and verified that there was a warrant for Plaintiff's arrest. (*Id.* at 54.) Plaintiff was arrested on the warrant. (*Id.* at 53.) Ultimately, as part of a stipulated agreement, the charges were dismissed. (Plaintiff's Exhibit 22.)

## II. LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 574. The question is "whether the evidence

8

presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

III. ANALYSIS

    A. Warrantless Arrest for PPO Violation on June 10

A warrantless arrest by a police officer is reasonable under the Fourth Amendment when the officer has probable cause to believe a criminal offense has been or is being committed. *Devenbeck v. Alford*, 543 U.S. 146, 152 (2004). "In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)). Probable cause to make an arrest exists when the facts and circumstances within an officer's knowledge, based upon reasonably trustworthy information, is sufficient for a prudent person to believe the accused committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Diamond v. Howe*, 288 F.3d 932, 936 (6h Cir. 2002). *See Devenbeck*, 543 U.S. at 152 ("whether probable cause exists depends upon the facts known to the arresting officer at the time of the arrest."). A court must assess the existence of probable cause from the perspective of a reasonable officer on the scene, rather than with the benefit of 20/20 hindsight. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citing *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)).

An arrest is constitutional if any justification exists within the facts known to the arresting officer at the time of the arrest. *Devenbeck*, 543 U.S. at 153; *Fox v. Desoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Devenbeck*). *See Zantello v. Shelby Township*, 277 F.App'x 570. 573 (6th Cir. 2008) ("even if the officers did not have probable cause to arrest Zantello for [felonious assault] (which they did), they surely had probable cause to arrest him for run-of-the-mine assault."). Even

9

though states may adopt statutes that are more protective of individual rights than the United States Constitution, a violation of state law will not support a § 1983 claim. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6h Cir. 1995). Although states may adopt additional restrictions on arrests, the federal constitution's protections remain the same.

> State arrest restrictions are more accurately characterized as showing that the State values its interests in forgoing arrests more highly than its interests in making them, or as showing that the State places a higher premium on privacy than the Fourth Amendment requires. A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional.

*Virginia v. Moore*, ___ U.S.___, 128 S.Ct. 1598, 1606 (2008). Ordinarily the existence of probable cause is a question for the jury, unless there is only one reasonable determination possible. *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (citing *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003)).

Officer Lytle had probable cause to arrest Plaintiff for a violation of the March 2005 PPO. After he responded to Ms. Rutledge's telephone call, Officer Lytle testified Ms. Rutledge gave him her copy of the PPO and he verified the conditions of the PPO with Central Dispatch. (Lytle Dep. at 29.) Officer Lytle also testified he verified with Central Dispatch that the PPO had been served on Plaintiff. (*Id.* at 40.) After receiving confirmation the PPO existed, its conditions, and that it had been served, Officer Lytle arrested Plaintiff for violating the PPO.

Plaintiff argues there are several issues of material fact. First, Plaintiff asserts there is no proof that either Officer Lytle or Officer Rosenberg ever confirmed the PPO had been processed. Plaintiff is simply incorrect. Officer Lytle testified he did receive confirmation the PPO had been served on Plaintiff. There indeed may be a question of fact as to whether Plaintiff was actually

served based on the exhibits submitted by the parties. Whether Plaintiff was in fact served or not does not create a question of fact as to whether Officer Lytle was told Plaintiff was served. In light of the evidence presented by Defendants, Plaintiff has offered no evidence from which this Court might infer Officer Lytle was not so informed. Plaintiff's discussion of Michigan's PPO statute, MCL § 600.2950, Michigan's stalking statute, MCL § 600.2950a, and the Michigan statute governing warrantless arrests for violations of PPOs, MCL 764.15b, is misplaced. Violations of the provisions contained in those statutes do not give rise to section 1983 claims.

Second, Plaintiff argues the arresting officers did not have probable cause to make an arrest. Plaintiff asserts the "line of sight" language was clearly crossed out by Judge Corsiglia. While Plaintiff's copy of the PPO may reflect the language is clearly crossed out, Ms. Rutledge's copy, which as shown to Officer Lytle, does not clearly have the language crossed out. The copy of the PPO shown to Officer Lytle appears to have the "line of sight" language underlined. In addition, Officer Lytle testified that he verified the conditions of the PPO before speaking with Plaintiff. (Lytle Dep. at 28-30.)

Third, Plaintiff argues he was never in Ms. Rutledge's line of sight. Plaintiff further argues he never appeared at Plaintiff's place of work. The officers here had probable cause to arrest Plaintiff for "appearing at petitioner's workplace or residence." (2nd PPO.) Plaintiff knew where Ms. Rutledge worked because he admits, three months earlier, he opened the door to the gallery and saw her standing behind the cash register. Plaintiff parked his car in place which afforded him the opportunity to walk by the gallery. Mr. Green testified he made eye contact through the gallery window with Plaintiff. The arresting officers were given all this information before they spoke with Plaintiff at the restaurant. Based on these facts and circumstances, a prudent person would believe

11

Plaintiff had violated the provision of the PPO prohibiting him from appearing at Ms. Rutledge's place of work.

B. Malicious Prosecution

The Sixth Circuit Court of Appeals has recognized the Fourth Amendment supports federal claims for malicious prosecution when plaintiffs accuse defendants of wrongfully investigating, prosecuting and convicting them. *Thacker*, 328 F.3d at 258-259 (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-1007 (6th Cir. 1999)). In order to establish a claim for malicious prosecution, a plaintiff must show "at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" *Id.* at 259 (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 308-311 (6th Cir. 2001)).

Having resolved the issue of probable cause in Defendants' favor, Plaintiff cannot maintain his claim for malicious prosecution.

C. Investigation Leading to Arrest Warrant

An investigator may be held liable under section 1983 for making materially false statements, made either knowingly or in reckless disregard for the truth. *Id.* (citing *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999)). A valid warrant will not extinguish a plaintiff's false arrest claim brought under section 1983 on summary judgment where the plaintiff presents evidence that a defendant intentionally omitted information or was intentionally misleading regarding information critical to the finding of probable cause. *Voyticky v. Timberlake*, 412 F.3d 669, 677 n. 4 (6th Cir. 2005) (citing *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) and *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997)).

Plaintiff argues whether Officer Reyes conducted an adequate investigation is subject to a

factual dispute. Plaintiff asserts Officer Reyes could not possibly have gone to the address identified in his report. Aaron Silver lived at that address and ran a kennel there. (Aaron Silver Dep. at 39-40, 87). He testified he had no recollection of any police officer leaving a business card on his door. (*Id.* at 40.) He further testified if anyone had come to the property, the dogs would have started "barking like crazy." (*Id.* at 88.) Aaron Silver stated he was at the house all morning on June 12. (*Id.* at 89.) Plaintiff also argues none of the members of the Silver family were in Douglas on June 12.[8]

Taking the facts as Plaintiff alleges, Plaintiff has not established Officer Reyes misrepresented material information on his request for a warrant. Officer Reyes' report of the incident, on which the request for a warrant was based, largely reflects the facts as alleged by Gail and Lance Rutledge. If true, those facts establish a basis for concluding Plaintiff violated the PPO. Neither has Plaintiff established Officer Reyes omitted information critical to the determination of probable cause on his request for a warrant. Plaintiff does not identify what information was left out or how that information was critical to the determination of probable cause.

D. July 21 Arrest Based on Warrant

Arrest warrants may be issued only upon a showing of probable cause. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (citing *Green v. Reeves*, 80 F.3d 1101, 1105 (6th Cir. 1996)). "In a civil rights case, investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause." *Id.* (citing *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989)). For the purposes of determining civil liability for individual officers, the police are entitled to rely on the information provided by the dispatcher. *Feathers v. Aey*, 319 F.3d 843,

---

[8]Plaintiff cites to the depositions of Plaintiff's father and three sisters.

13

851 (6th Cir. 2003). *See United States v. Hensley*, 469 U.S. 221, 232-233 (1985) (holding officers who objectively rely on a flyer or bulletin issued in the absence of reasonable suspicion may violate the Fourth Amendment when making a *Terry* stop, but those officers making the stop would have a good-faith defense to any civil suit). An arrest made on a valid warrant is ordinarily a complete defense to a federal claim for false arrest brought under section 1983. *Voyticky*, 412 F.3d at 677.

Officer Giles and Chief Giles were entitled to rely on the information provided by Central Dispatch who informed them there was a warrant for Plaintiff's arrest. Plaintiff asserts Officer Giles knew the arrest warrant was not valid because Judge Corsiglia had admonished the police department earlier that day for failing to follow his orders. Judge Corsiglia's admonition for failing to fill out a complaint form does not implicate the substantive validity of either the earlier warrantless arrest or the warrant upon which the officers relied. Plaintiff alleges the charges against him had been dismissed. Plaintiff is correct that the charges against him on the warrantless arrest had been dismissed because no complaint form as required by Judge Corsiglia's letter had been filed. Plaintiff fails to establish how circumstances causing the purely procedural dismissal of the earlier complaint undermines the validity of the warrant issued on a totally separate incident for a violation of a PPO.

E. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, ___ U.S. ___; 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). *See also Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (same) (citing *Williams v. Mehra*, 186 F.3d 685, 691

14

(6th Cir. 1999) (en banc)). The protection applies whether the official's error is based on a mistake of law, mistake of fact or a mistake based on mixed questions of law and fact. *Pearson*, 129 S.Ct at 815 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J. dissenting)). Under *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court outlined a two step procedure for resolving an official's claim for qualified immunity: (1) a court must decide whether the facts the plaintiff alleges constitute a violation of a constitutional right and (2) a court must then decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* at 815-816. The Supreme Court held the *Saucier* sequence was no longer mandated and authorized judges to exercise their sound discretion in deciding which of the two prongs should be addressed first. *Id.* at 818.

The issue of qualified immunity in the Sixth Circuit is resolved by applying a three part test which requires a court to determine (1) whether a constitutional right was violated, (2) whether the right was clearly established and one of which a reasonable person would have known, and (3) whether the official's action was objectively unreasonable under the circumstances. *Bornhorst*, 513 F.3d at 511 (citing *Mehra*, 186 F.3d at 691). *See also Everson v. Leis*, ___ F.3d ___, 2009 WL 414625 n.4 (6th Cir. Feb. 20, 2009). "An arresting officer is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting officer." *Bornhorst*, 513 F.3d at 511. (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, [], will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344-345 (1986) (citations omitted.)

When a defendant raises qualified immunity as a defense, the plaintiff bears the burden of establishing the defendant is not entitled to qualified immunity. *Everson,* 2009 WL 414625 * 6 (6th Cir. Feb. 20, 2009) (citing *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006)); *Bing v. City of Whitehall*, 456 F.3d 555, 563 (citing *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999)). The plaintiff must show that the right was clearly established. *Everson*, 2009 WL 414625 * 6 (citing *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004)). The defendant, on the other hand, bears the burden of showing the challenged action was objectively reasonable in the light of existing law. *Id.* (citing *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004).

Defendant Officers are entitled to qualified immunity. As explained above, neither arrest violated Plaintiff's constitutional rights. The officers who arrested Plaintiff on June 10 had every reason to believe Plaintiff violated the PPO when he walked past Ms. Rutledge's place of work. The officer who arrested Plaintiff on July 21 relied on a facially valid warrant. Defendants have shown the officers' actions were objectively reasonable in light of existing law.

F. Municipal Liability

To establish a section 1983 claim against a municipality, a plaintiff must show (1) the harm was caused by a constitutional violation and (2) the municipality is responsible for the constitutional violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Plaintiff asserts the City can be held liable because Judge Corsiglia notified all law enforcement provisions that they would be responsible for filing complaints for PPO violations. Plaintiff asserts the evidence shows law enforcement officials did not do anything about Judge Corsiglia's notification and did not review existing cases to assure compliance with the directive. Plaintiff further asserts Officer Giles did nothing following the rebuke from Judge Corsiglia at Plaintiff's arraignment on July 21.

Plaintiff has failed to establish municipal liability. Plaintiff has not established that failure to follow Judge Corsiglia's notification constitutes a constitutional violation. Judge Corsiglia merely required law enforcement as a matter of his court's procedures to file a complaint form in order for PPO violations to proceed. Plaintiff cites no authority suggesting failure to follow such a procedure amounts to a violation of federal constitutional rights. As explained above, Plaintiff's arrests were constitutional.

IV. CONCLUSION

For the reasons provided above, Defendant is entitled to summary judgment. Taking the facts in a light most favorable to Plaintiff, Defendants have put forth documentary evidence establishing a lack of genuine issue of material facts on each of Plaintiff's claims. Plaintiff has not made a sufficient showing that genuine issues of material facts remain.

ORDER

Defendants' motion (Dkt. No. 87) for summary judgment is **GRANTED. IT IS SO ORDERED.**

Date:  July 23, 2009                             /s/ Paul L. Maloney
                                                 Paul L. Maloney
                                                 Chief United States District Judge